21679. GEORGIA FERTILIZER COMPANY *v.* WALKER.

DECIDED FEBRUARY 24, 1932.

*Branch & Snow,* for plaintiff in error. *J. B. Baum,* contra.

BELL, J. Georgia Fertilizer Company on March 4, 1929, sold to F. B. Walker Sr. 250 sacks of fertilizer known as A. P. Compound 10-0-4, for the sum of $505. This company was the manufacturer of the fertilizer. As indicated by the figures "10-0-4" the fertilizer was sold, guaranteed and branded as containing 10 per cent. phosphoric acid and 4 per cent. potash. It is immaterial what is indicated by the naught in the quoted numerical description, as

it means an absence of some material. A subsequent purported analysis by the State chemist of samples taken from a portion of this particular fertilizer showed a deficiency of more than 10 per cent. of the potash stated in the guaranteed analysis as published and branded; whereupon the purchaser brought suit against the fertilizer company under sections 3 and 4 of the act of August 22, 1911 (Ga. L. 1911, p. 172, 173, Park's Code (1914), §§ 1778(c), 1778(d)), to recover the penalty of "twenty-five per cent. of the purchase-price plus the shortage of such commercial fertilizer," as the liability imposed by law for a false and incorrect branding. The defendant filed a demurrer upon various grounds, including an attack upon the constitutionality of these sections. A judgment overruling the demurrer was affirmed in 171 *Ga.* 734 (156 S. E. 820). The case was then tried upon the issues made by the petition and the answer, which amounted to a general denial, and resulted in a directed verdict in favor of the plaintiff. The court denied the defendant's motion for a new trial, and the defendant excepted. The provisions of the act of 1911 upon which the suit was predicated are as follows:

Section 3. "Any manufacturer, manipulator, dealer or vendor of commercial fertilizers in this State, who publishes by branding or by attaching a tag or tags upon the sacks or packages of fertilizer a false or incorrect analysis of the components and ingredients thereof shall be liable in law to any and every purchaser of such falsely and incorrectly branded or tagged fertilizer in a sum of twenty-five per cent. of the purchase-price plus the shortage of such commercial fertilizer."

Section 4. "A deficiency of more than ten per cent. below the guaranteed analysis of the fertilizers as published and branded or tagged on the sacks or packages thereof shall be held and declared by the courts of this State to constitute a false and incorrect publishing, branding or tagging within the intent, purpose and meaning of this act.

For evidence, the plaintiff relied mainly upon a certified copy of the analysis by the State chemist. The defendant made numerous objections to the introduction of this certificate, and the overruling of these objections and the direction of the verdict are assigned as error in the motion for a new trial.

■ There are three code sections which refer to analyses by the

State chemist as evidence in cases of this sort. Civil Code (1910), §§ 1773, 1783, 1790. We will endeavor to show later that the first two of these sections are identical in meaning, and the section last referred to has been held to be unconstitutional in so far as it "purports to make an official analysis of fertilizers by the State chemist conclusive evidence." *Southern Cotton Oil Co.* v. *Raines,* 171 *Ga.* 154 (4 *b*) (155 S. E. 484). However, that section is irrelevant to the present discussion, since the analysis was not made in accordance with the provisions of sections 1785 to 1790 inclusive, and the plaintiff is not relying upon these sections.

The certified copy of the analysis as introduced in evidence contained the words, "Subject 25% penalty of purchase price 10% shortage Potash and 25 cts. per ton." It is contended that the analysis (meaning by this the certified copy thereof) was not limited to a statement of ingredients of the fertilizer, but included a statement as to the effect of the analysis on the plaintiff's right, under the law, to recover for the deficiency. The words, "10% shortage Potash," were not improper. The analysis showed a shortage to this extent, and the use of this language indicated merely the result of the chemist's analysis as based upon other figures shown in the certificate; but as to the other language to which exception was taken, that is, "Subject 25% penalty of purchase price," and "25 cts. per ton," indicating that the fertilizer company was liable to the penalty and damage prescribed by law, we think the certificate went beyond the legal requirements, and that from a technical standpoint it was subject to the objection interposed. The statutes which refer to such a certificate as evidence do not contemplate legal conclusions of this nature. In a case involving an issue of fact for the jury, such an interpolation might be prejudicial to the manufacturer or dealer and render the certificate objectionable as evidence. In the present case, however, as will be seen later, there was no issue of fact to be determined by the jury, and, so far as this objection is concerned, the error in overruling it was harmless.

█ Another objection to the certificate of analysis was that the samples were not sealed in bottles at the time of sampling, as required by law. In *Southern Cotton Oil Co.* v. *Raines,* 171 *Ga.* 154 (supra), the Supreme Court said: "Where penalties are sought to be recovered, there must be a strict compliance with the statute.

. . Strictly construed, the statute requires that the samples be placed *in bottles at the time they are drawn from the packages;* that after all are drawn they be thoroughly mixed and from the mixture 'two subsamples' be drawn according to the method known as 'quartering,' and from this that 'two sample bottles' be filled, and that those two bottles be marked and disposed of as further directed by the statute. The requirements of the statute are not satisfied by placing the samples as drawn in paper bags and carrying them to another place for final preparation as provided in the statute. On account of failure of the inspector to comply with the statute in this respect, the report was inadmissible as an official paper."

The statute referred to in that case provided in part as follows: The inspector, after thoroughly mixing the samples as drawn from the several packages of the fertilizer, "shall, by the method known as 'quartering,' draw from such thoroughly mixed samples two subsamples, and with them fill two sample bottles, and shall plainly write on a label on said bottles the number of said sample, and shall also write on the label on one only of said bottles the name of the fertilizer, acid phosphate, or other fertilizer material, also the name of the manufacturers. He shall then seal both of said bottles, and shall forward to the commissioner of agriculture the said samples so drawn by him." Civil Code (1910), § 1781.

The language italicized in the quoted excerpt from the decision of the Supreme Court does not appear in the statute, and, therefore, must be taken as the court's interpretation thereof. If the law requires that the samples shall be placed in bottles at the time they are drawn from the packages, it would seem to follow that the bottles must be sealed at the same time and place. The requirement that the inspector "shall then seal both of said bottles" has continued reference to the preparation of the samples and contemplates the completion of that act.

The evidence in this case shows that the inspector drew samples from many other lots of fertilizer on the same day, and that he did not seal the bottles until he arrived at his home that night. He testified that he did everything else required by the law as to the preparation and care of the samples, and that he kept them locked in his automobile when he did not have them under his immediate watch and control. The purpose of the law was to prevent accident, mistake and meddling, and it is possible that even the in-

spector might get his samples mixed and make an error. Nothing of this kind happened in the present case; and, yet, under the law as construed by the Supreme Court, the samples must be prepared and the preparation finished at the time the samples "are drawn from the packages." Mere vigilance and precaution on the part of the inspector can not serve as a substitute for the law, and unless the statute is complied with, no analysis made of the samples can be legally admitted in evidence over proper objection.

It is noticed that the statute, in the same sentence which requires the sealing of the bottles, proceeds to say that the inspector "shall forward to the commissioner of agriculture the said samples so drawn by him. It might be argued that under the same reasoning the samples should be also *transmitted* "at the time they are drawn," and that if this interpretation would seem to be unreasonable, then the requirements as to sealing the bottles should in like manner be less rigidly construed. There is a logical difference, however, between the act of preparation and sealing, and that of transmission. The two operations are materially different in nature and purpose, and it may be that the law would allow a pause between the two, notwithstanding the combined act of bottling and sealing must be completed at the time the samples are drawn. We therefore conclude that the second objection should have been sustained.

■ A further objection to the certificate was that the undisputed testimony of the inspector showed that he transmitted the samples, not to the commissioner of agriculture, but to his "chief clerk." The Civil Code, § 1788, provides that where samples are drawn "in the presence of both purchaser and seller," under section 1785 et seq., the ordinary shall, on application of the purchaser, "forward said sample deposited with him to the State chemist;" but as we have stated above, this provision is inapplicable in the present case. The plaintiff relied upon an attempt by the inspector to comply with section 1781, which requires that the samples shall be forwarded to "the commissioner of agriculture."

The Civil Code, § 2066, provides that "said commissioner shall be allowed one clerk to be chosen by himself, to assist in the discharge of the clerical duties of his office." Whether or not the law as to transmitting samples of fertilizer for official in-

spection is complied with by sending the samples to a person who is authorized to assist in the performance only of the "clerical duties" of the commissioner is a question which it is not absolutely necessary to decide in the instant case, and since the judges participating in this decision are not fully agreed at this time as to the proper answer to such question, we have concluded to leave it open for the present. In order to be doubly sure of a strict compliance with the law, and to avoid any possible miscarriage of justice in the future, it is respectfully suggested that inspectors should hereafter transmit the samples directly to the commissioner, and not to his clerk, in accordance with the strict language of the statute.

■ A fourth ground of objection to the introduction of the certificate was that it appeared from the undisputed testimony of the inspector, and also from his report, that he drew samples from only 100 sacks, whereas the plaintiff is suing for a penalty and deficiency in reference to 25 tons, or 250 sacks. We do not say that it would have been necessary to draw samples from any particular proportion of the 250 sacks, if the plaintiff were not relying upon what he declares was an "official analysis." If he were seeking to prove his case by sworn testimony as to the correctness of a private analysis, as would seem to be permissible under the decision in *Jones* v. *Cordele Guano Co.*, 94 *Ga.* 14 (20 S. E. 265), and in the *Raines* case, supra (see headnote 9), instead of relying merely on the certificate, it might, perhaps, be sufficient if samples were drawn from any such proportion of the sacks as would reasonably indicate a fair representation of the entire lot, this question to be determined by the jury under all the facts and circumstances. But the section as to inspections which may result in an official analysis provides that the inspector "shall carefully draw samples as follows: In lots of ten packages or less, from every package; in lots of 10 to 100 packages, from not less than 10 packages; in lots of 100 packages and over, from not less than 10 per cent. of the entire number." It appeared from the testimony of the inspector in this case that he inspected the fertilizer at the request of the plaintiff, and that only about 100 sacks were available. His report was limited to this number as the "lot" inspected. The plaintiff did not point out or give him access to more. It is our opinion that in these circumstances,

even if the certificate was otherwise admissible, the spirit of the statute was not complied with, as to more than 100 sacks. It is true that samples were drawn from 25 sacks, which were 10 per cent. of the entire quantity purchased, but if this was a compliance with the law, it would have been equally permissible to have drawn samples from 25 sacks, where only 25 sacks were seen. In other words, the plaintiff could have used all but 10 per cent. of the entire quantity purchased, namely 250 sacks, and the officer could have come along and inspected these remaining 25 sacks, and made a report on that number, and still have obtained a sample which could be claimed to be a representation of the entire quantity purchased. If the inspection had been spread to a larger number of sacks in this case, the analysis might have shown no deficiency. On the other hand, it might have shown a much greater deficiency, so that the plaintiff himself might have been the winner. The rule is equally fair to both parties. The purpose of the law is to obtain a fair sample of the lot or quantity of fertilizer which is made the subject of inspection.

Another question raised for decision, which may be remarked upon in this connection is whether the plaintiff could recover the penalty on the entire quantity of fertilizer purchased, where the samples were drawn from only 100 of the sacks available for inspection. If the inspection and analysis were in all other respects regular, so as to constitute an "official analysis," it is our opinion that the plaintiff would be entitled to a recovery, but that the amount of such recovery should be limited to the basis of 100 sacks. The mere fact that the evidence did not show a right to recover the *full amount* sued for would be no valid reason for excluding the certificate.

■ It is insisted that the court erred in directing the verdict in favor of the plaintiff, for several reasons, some of which we have already alluded to, and as to which further reference is unnecessary. We come now to what we think is the main point in the case, which presents the question of what is an "official analysis." As stated in division 1 above, there are three sections of the code having reference to official analyses as evidence, one of which is section 1790. This and the cognate sections (Civil Code of 1910, §§ 1785-1792) are a substantial codification of the act of December 27, 1890 (Ga. L. 1890-91, p. 142), providing for

private sampling by the parties to a sale and the analysis of such sample by the State chemist, with the ordinary as a go-between; but obviously there was no "official analysis" under this law, and the plaintiff does not so contend. The law provides only one other method of obtaining an analysis by the department of agriculture, which is expressly called the "official analysis." This analysis, however, is referred to both in section 1773 and in section 1783. In *Swift* v. *Duncan*, 154 *Ga.* 487, (114 S. E. 897), these sections were treated as being identical, but it was unnecessary in that case to state their origin.

Section 1773 is as follows: "A copy of the official analysis of any fertilizer or chemical, under seal of the department of agriculture, shall be admissible as evidence in any of the courts of the State, on the trial of any issue involving the merits of said fertilizer." The language of this section first appeared in the act of February 26, 1877 (Ga. L. 1877, p. 37), entitled "an act to render more efficient and economical the inspection and analysis of fertilizers, and to amend the law in relation to the inspection, analysis, and sale of the same." By section 3 of that act the legislature provided for the appointment of not exceeding six inspectors, and defined their duties in more or less general terms, but certainly with the same object in view which we find in the later laws. By section 2 it was provided that "A copy of the official analysis of any fertilizer or chemical, under seal of the department of agriculture, shall be admissible as evidence in any of the courts of this State, on the trial of any issue involving the merits of said fertilizer." This provision was carried *in* section 1553(b) of the Code of 1882 and *as* section 1553 of volume 1 of the Code of 1895, and it is this provision which constitutes section 1773 of the present Code.

Section 1783 provides in part as follows: "The said official analysis of such fertilizer material, under the seal of the commissioner of agriculture, shall be admissible as evidence in any of the courts of this State on the trial of any issue involving the merits of such fertilizer or fertilizer material." This provision was taken from section 11 of the act approved December 18, 1901 (Ga. L. 1901, p. 65), entitled "an act to regulate the registration, sale, inspection and analysis of commercial fertilizers, acid phosphates, fertilizer materials and chemicals, in the State of Georgia,

and to consolidate all laws relating to said sales, inspection and analysis, and to repeal all other laws or parts of laws in conflict therewith." That statute, as indicated by its title, was intended to consolidate the previous laws relating to sales, inspections, and analyses of fertilizers. Section 9 provided for the appointment of inspectors; section 10 provided the method of taking samples, and this section is the source of section 1781 of the present Code having reference to inspections. As stated above, the quoted provision of section 11 provided for the admissibility in evidence of a copy of the analysis by the State chemist.

From a comparison of the act of 1877 and the act of 1901 it is perfectly manifest that their respective provisions as to the admissibility of analyses as evidence were intended to cover the same subject, and are therefore identical in meaning and purpose. Seemingly the provision of section 11 of the act of 1901 relating to the "official analysis" superseded the like provision of the act of 1877, and the last-mentioned provision should not have been included in the Code. It follows that these two provisions must be construed as dealing with a single subject, and as providing for only one "official analysis." The only other official analysis is that referred to in section 1790, supra. We therefore disagree with counsel for the defendant in error in the argument that there are three kinds of official analyses which can be admitted as evidence on certificate under the laws of this State.

Bearing in mind the identity of section 1773 and section 1783, the decision of the Supreme Court in *Jones* v. *Cordele Guano Co.,* supra, is illuminating. In that case Mr. Justice Lumpkin, speaking of the analysis now referred to in section 1773 of the Code of 1910, said: "As it requires express legislation to render any copy of an analysis admissible as original evidence, necessarily the terms of the law must be fully and exactly complied with in order to obtain the benefit of its provisions. Therefore, the analysis must be an official one, or a copy of it taken from the records of the department of agriculture can not be introduced. As we understand our system for the inspection and analysis of commercial fertilizers, samples are taken by the inspectors and submitted for analysis to the State chemist, who makes reports to the commissioner of agriculture, which reports are recorded in the office of the latter. Analyses thus made are

official.. We know of no law making official an analysis by the State chemist at the instance or request of a purchaser of fertilizers. Indeed, as we understand it, the State chemist is under no obligation to make an analysis for any private person at all. If he does so, it is simply a matter of courtesy; and although he may report an analysis thus made to the department of agriculture, and it may be entered upon the records of that department, this will not give to that analysis an official character, by virtue of which a copy of it will be rendered admissible as evidence in the courts. . . Strictly speaking, the commissioner of agriculture should not have recorded in his department any analysis made by the State chemist, except such as the law requires the latter to make and report to that department. It follows that any analysis which is of record in the agricultural department is prima facie official, because, presumably, any analysis of fertilizers made by the State chemist and reported by him to the commissioner of agriculture is of a sample, or samples, furnished the chemist officially by an inspector of fertilizers. Therefore, unless it appears that an analysis of fertilizers made by the State chemist was of a sample received from some other source, a copy of an analysis made by him and certified under the seal of the department of agriculture is admissible in evidence under the section of the code [Code of 1882, § 1553(b), Code of 1895, § 1553, Civil Code of 1910, § 1773] above cited."

It is true that the analysis offered in evidence in the present case appears to have been made upon samples taken and transmitted not by a private individual but by the official inspector, but it does not follow that the inspection was made in such a manner and under such circumstances that the analysis would constitute an official analysis within the meaning of section 1773 and section 1783. The samples which may be made the basis of the "official analysis" must be taken in accordance with section 1781, and there is nothing whatever in this section as to drawing samples from fertilizers sold to a particular person. It provides only for the method of taking samples generally from the various lots of fertilizer marketed or intended for market in this State, and it must be construed in connection with section 1783, a part of which has been quoted above, but which also provides that "A sample of all fertilizers or fertilizer material drawn by the official

inspectors and filed with the commissioner of agriculture, shall be marked by number and delivered by said commissioner of agriculture to the State chemist, who shall make a complete analysis of the same, and certify, under same number as marked, said analysis to said commissioner of agriculture, which analysis shall be recorded as official and entered opposite the brand of fertilizers or fertilizer material which the mark and number represent." This is what is called the official analysis, in the decision of the Supreme Court in *Swift* v. *Duncan,* supra, wherein it was held: "The laws of this State, relating to the inspection of fertilizers and fertilizer materials, do not require the sub-samples, taken by the inspectors from each separate lot inspected, analyzed; but only require an analysis of a sample made up or taken from all samples drawn by inspectors from different lots of the same brand. . . The analysis of this composite sample is the official analysis referred to in the Civil Code (1910), §§ 1773, 1783; and it is not essential that it should appear that the analysis was made from a sample taken from the particular lot of fertilizer for the purchase-price of which recovery is sought."

An analysis which was made by the State chemist merely upon samples of fertilizers sold to a particular person can not be treated as the official analysis contemplated by sections 1773 and 1783, unless it further appears that these samples constituted "all samples drawn by inspectors from different lots of the same brand." If other samples of the same brand had been inspected throughout the State, these samples should have been included in the composite sample from which the official analysis was made. Presumably, other samples of the same brand were examined and analyzed by the State through the department of agriculture, and therefore the samples taken from the plaintiff's lot would not have constituted the composite sample. With nothing to show that the analysis was not *the* official analysis contemplated by statute, the certificate would have been prima facie admissible under the *Jones* case, supra. But the undisputed evidence affirmatively showed it was not the official analysis intended by any of the code provisions as to the admission of analyses in evidence. This question was not *presented* in the *Raines* case in either of the decisions by the Supreme Court in that litigation (167 *Ga.* 880, 147 S. E. 77; 171 *Ga.* 154, 155 S. E. 484), or in *Terry* v. *Swift,*

21 *Ga. App.* 431 (94 S. E. 658), and if there is anything in either of these decisions which might tend to a contrary conclusion, it is not controlling. See also, in this connection, *Arlington Oil &c. Co.* v. *Swann,* 13 *Ga. App.* 562 (79 S. E. 476); *Duncan* v. *Swift,* 27 *Ga. App.* 820 (110 S. E. 24).

We do not say that the analysis made in this case was not *an* official analysis. Our ruling is that it was not *the* official analysis which the law intends may be proved and admitted in evidence by a certified copy. The other evidence showing affirmatively and without dispute that the certificate introduced in evidence by the plaintiff was in reference to an analysis which was not the "official analysis" contemplated by law, the certificate was without probative value as to the deficiency complained of. *Patterson* v. *Ramspeck,* 81 *Ga.* 808 (2, 3) (10 S. E. 390). The defendant, however, offered in evidence what appeared to be the official analysis, and under the *evidence adduced* the court should have directed a verdict in favor of the defendant instead of the plaintiff.

While the judgment refusing a new trial must be reversed, this will not mean that the plaintiff's case is hopeless. If under the rules of evidence he can prove that the identical samples taken from his fertilizer were analyzed by the State chemist, and then adduce the sworn testimony of this officer as to its ingredients, and if the evidence would authorize the jury to find that the samples taken represented a fair proportion of the quantity purchased, or of the 100 sacks, then it may be that a verdict in his favor would be warranted on the basis of the one or the other of these quantities, according to the opinion which the jury may entertain of the evidence. It is not absolutely necessary that an aggrieved party shall resort either to an official inspection or to an official analysis, in order to make out his case, but it is necessary that the analysis shall be the "official analysis" contemplated by law before the certificate of the commissioner of agriculture instead of the sworn testimony of the chemist can be admitted as evidence of the deficiency. Where the testimony of the chemist instead of a certificate shall be necessary, depositions would, of course, be sufficient.

The above conclusions are supported by the second decision in the *Raines* case in which the Supreme Court said: "In the suit

for penalties under the provisions of sections 2, 3, and 4 of the act of 1911 (Acts 1911, p. 172), supra, on the question as to insufficiency of the ingredients to comply with the requirements of the statute, the parties would not be restricted to evidence of an official analysis by the State chemist, but might rely on any competent evidence tending to show the facts as to sufficiency or insufficiency of the ingredients of the fertilizer or fertilizer material. Testimony of an agent of the vendor, that he took samples from 'about every fifth sack' of all the fertilizer in question and mixed the samples well and delivered them to the 'office man' of the vendor, and other evidence that the office man forwarded the samples to the private chemist of the vendor and that such chemist analyzed the samples and furnished an analysis of the samples which showed that there was no deficiency in the ingredients, and that such analysis was true, was admissible over the objections that the samples were not taken as required by law, and that there was no evidence that the analysis was an official analysis."

The rulings quoted above are entirely consistent with the ruling made by the Supreme Court in its prior decision in the same case (167 *Ga.* 880 (3), supra) to the effect that "a private analysis would not be admissible where there is evidence of an official analysis as provided in the Civil Code (1910), §§ 1785-1790." Neither in the *Raines* case nor in the present case was there any analysis under these sections. Where these provisions are adopted by the parties as the method of ascertaining a deficiency (this being the second method referred to in the first division of this opinion), it would seem that such analysis, being made from samples taken by the joint action of the purchaser and seller (see also sections 1791, 1792), would be the only admissible evidence of a deficiency, assuming that section 1790 may be still considered as constitutional to the extent of treating the certificate as prima facie and not "conclusive evidence" of the facts therein stated. Where a purchaser obtains a specific analysis as to a particular lot of fertilizer, and the same is duly established as being correct, it stands to reason that it would take precedence over a composite analysis; that is, an analysis made from a composite sample.

What is said above is based upon the statutes and decisions, without reference to any rule of the commissioner of agriculture,

no rule having been introduced in evidence. In the act of October 19, 1891 (Ga. L. 1890-91, p. 143), it was provided that "the commissioner of agriculture shall have the authority to establish such rules and regulations in regard to the inspection, analysis and sale of fertilizers, chemicals and cottonseed meal, not inconsistent with the provisions of this act, as in his judgment will best carry out the requirements thereof." A similar provision was contained in section 12 of the act of December 18, 1901 (Ga. L. 1901, p. 65). But neither of these provisions is carried in the Code of 1910. Whether or not these provisions are still the law, and, if so, whether it would be "inconsistent" with the statutes as to inspection and analysis for the commissioner to promulgate a rule as to inspection in particular cases, so that an analysis then made would constitute an "official analysis" and be admissible in evidence as such in a case like the present, are questions which are not presented for decision in this case. As stated above, if any rule upon the subject was existent, it was not introduced in evidence.

Counsel for the defendant in error contends that the certified copy of the analysis introduced in this case was admissible under the provision of the Civil Code, § 5798, that "the certificate or attestation of any public officer, either of this State or any county thereof, shall give sufficient validity or authenticity to any copy or transcript of any record, document, paper of file, or other matter or thing in their respective offices, or pertaining thereto, to admit the same in evidence in any court of this State." This statute would seemingly be applicable to any valid rule or other official matter of file or of record in the office of the commissioner of agriculture, but would not authorize the admission in evidence of a *certified copy* of an analysis which was not "official" within the meaning of the statutes, so as to constitute evidence of a deficiency.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*